RICHARD BLUMENTHAL, ATTORNEY GENERAL *v.*
KIMBER MANUFACTURING, INC., ET AL.
(SC 16912)

Sullivan, C. J., and Norcott, Katz, Palmer and Zarella, Js.

Argued May 20—officially released July 29, 2003

*Susan Quinn Cobb*, assistant attorney general, with whom, on the brief, was *Richard Blumenthal*, attorney general, for the appellant (petitioner).

*Richard S. Taffet*, pro hac vice, with whom were *Richard F. Wareing* and, on the brief, *Peter L. Costas* and *Jeanine M. Dumont*, for the appellees (respondents).

*Opinion*

KATZ, J. The petitioner, Richard Blumenthal, the attorney general of the state of Connecticut, appeals[1] from the decision of the trial court denying his applica-

---

[1] The petitioner appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

tion for an order requiring the respondents, Kimber
Manufacturing, Inc. (Kimber), a firearms manufacturer
with its principal place of business in Yonkers, New
York, and Leslie Edelman, Kimber's president, to com-
ply with the petitioner's discovery request for a certain
document sent from one Kimber employee to an attor-
ney and three other Kimber employees.[2] The petitioner
contends that the trial court improperly determined
that: (1) the communication was protected by the attor-
ney-client privilege; and (2) the communication was not
otherwise subject to disclosure under the crime-fraud
exception to that privilege. We conclude that the trial
court properly determined that the document was pro-
tected by the attorney-client privilege and that the peti-
tioner did not meet his burden of establishing that the
crime-fraud exception applies to exclude the document
from protection under the privilege. Accordingly, we
affirm the decision of the trial court.

The record discloses the following relevant facts. On
March 17, 2000, Smith and Wesson Corporation
(Smith & Wesson), a firearms manufacturer located in
Springfield, Massachusetts, entered into an agreement
with representatives of various federal, state and local
governmental agencies (agreement). The agreement
was an attempt to settle both pending and threatened
litigation by these governmental agencies against vari-

---

[2] Although a discovery order ordinarily is not immediately appealable
because it does not constitute a final judgment; see *Melia* v. *Hartford Fire
Ins. Co.*, 202 Conn. 252, 255, 520 A.2d 605 (1987); the present appeal is
distinguishable because the proceedings giving rise to it were brought pursu-
ant to the provisions of the Connecticut Antitrust Act (act); General Statutes
§ 35-24 et seq.; which authorize the attorney general to conduct investigations
and seek discovery orders from the trial court when violations of the act
merely are suspected and without the institution of an action alleging a
violation of the act. See *Lieberman* v. *Reliable Refuse Co.*, 212 Conn. 661,
663–64, 563 A.2d 1013 (1989); *In re Application of Ajello* v. *Moffie*, 179 Conn.
324, 326, 426 A.2d 295 (1979). In this case, Kimber has not yet been, and
may never be, named as a defendant in any litigation involving violations
of the act.

ous firearms manufacturers. The agreement required Smith & Wesson, as well as all other potential signatories to the agreement, to engage in certain practices, opposed by most of the firearms industry, regarding the manufacturing, sale and marketing of firearms. At the time of the proceeding before the trial court, Smith & Wesson was the only firearms manufacturer to have signed the agreement.

On May 2, 2000, based on his suspicion of the respondents' participation in a retaliatory economic boycott against Smith & Wesson, the petitioner issued to the respondents interrogatories and a subpoena duces tecum, pursuant to the petitioner's investigatory authority under General Statutes § 35-42, seeking documents "as to any matter relevant to any alleged violation of the Connecticut Antitrust Act"; General Statutes § 35-24 et seq.; and specifically any documents related to Smith & Wesson. On May 31, 2000, the respondents submitted responses, and thereafter submitted supplemental responses on July 20 and December 28, 2000. Unsatisfied with the respondents' disclosure, on March 20, 2001, the petitioner filed with the trial court an application for compliance. Thereafter, the respondents submitted five additional supplemental responses, leading to a total disclosure of approximately 577 pages of documents. After negotiation between the parties as to outstanding documents sought, the hearing on the petitioner's application for compliance was reduced to one issue—a claim of attorney-client privilege on a document sent via electronic mail (e-mail) by Dwight Van Brunt, a Kimber employee, to Edelman, Denis Schusterman, another Kimber employee, and Jerry S. Goldman, an attorney in private practice.[3] The e-mail also was

---

[3] The e-mail came to the petitioner's attention when the respondents inadvertently submitted it to him along with five other uncontested documents. The parties set aside the issue of whether the inadvertent disclosure waived the attorney-client privilege until after the trial court had determined whether the privilege otherwise applied. Ultimately, the trial court, *Freed*,

copied to Ryan Busse, another Kimber employee. The e-mail expressly referred to the Smith & Wesson agreement, and the firearms industry's initial reaction to it.

In response to a joint motion for entry of consent order, the trial court, *Bryant, J.*, directed the respondents to submit the e-mail to the court for an in camera determination of the privilege issue. The parties submitted to the court a joint stipulation of facts, setting forth the factual and procedural background of the matter. At a hearing on the consent order, following a joint request, the trial court sealed the record.

Goldman, one of the parties to whom the e-mail had been sent, appeared as counsel on behalf of the respondents.[4] Goldman represented to the court that, because the agreement arose out of a series of lawsuits that all named John Doe as a defendant in the complaints, potential firearms manufacturer defendants, like Kimber, needed to evaluate the agreement and the firearms industry's reaction to the agreement in order to plan an effective legal strategy of their own. Goldman also provided the court with the corporate titles of each of the e-mail recipients, which identified them as senior Kimber officers. Goldman contended that, because the reactions of others in the firearms industry to the agreement—such as whether to sign similar agreements or litigate—would inform Kimber's legal decision making, Kimber's management needed to keep track of these developments and communicate them to him, as Kimber's counsel.

*J.*, determined that the inadvertent disclosure did not result in a waiver of the privilege. That ruling is not at issue in this appeal.

[4] Although Goldman appeared on behalf of the respondents at the September 10, 2001 hearing, Peter L. Costas, Kimber's local counsel, submitted to the trial court the memorandum of law in opposition to the petitioner's motion for the consent order.

The petitioner contended that the e-mail was not subject to the attorney-client privilege because it was not marked as confidential and did not request legal advice; rather, according to the petitioner, the subject matter of the e-mail concerned ongoing business developments. The petitioner also contended that the respondents had presented no evidence that litigation had been filed or even threatened against Kimber, nor any evidence of the existence of "John Doe" defendants in such litigation. The petitioner further claimed that, because reference to the e-mail itself did not indicate that it satisfied the requirements of the attorney-client privilege, and because the respondents did not produce any evidence beyond the e-mail and the stipulated facts, the respondents had failed to satisfy their burden of proof to invoke the privilege. Furthermore, the petitioner argued that, even if the trial court were to infer that the e-mail had been a request for legal advice, and therefore privileged, it would be subject to disclosure under the crime-fraud exception to the privilege.

On September 10, 2001, the same day as the consent order hearing, the trial court, *Bryant, J.*, issued an order stating that the e-mail was subject to a valid claim of attorney-client privilege. On January 30, 2002, in response to the petitioner's motion for articulation, the trial court issued a memorandum of decision setting forth the reasons for its decision. Specifically, the trial court set forth and applied the four part test that we articulated in *Shew* v. *Freedom of Information Commission*, 245 Conn. 149, 159, 714 A.2d 664 (1998), for determining whether the attorney-client privilege applies to protect communications between corporate employees and attorneys retained by the corporation. The court determined that, under the test, the e-mail qualified for protection from disclosure. Additionally, the court concluded that the crime-fraud exception did not apply because the e-mail "is a patent update of

[firearms] litigation developments and does not advocate any criminal or illegal activity." This appeal followed.

Before addressing the merits of the petitioner's claims, we set forth the standard by which we review them. "We have long recognized that the granting or denial of a discovery request rests in the sound discretion of the [trial] court, and is subject to reversal only if such an order constitutes an abuse of that discretion. . . . [I]t is only in rare instances that the trial court's decision will be disturbed. . . . Therefore, we must discern whether the court could [have] reasonably conclude[d] as it did." (Citations omitted; internal quotation marks omitted.) *Olson* v. *Accessory Controls & Equipment Corp.*, 254 Conn. 145, 156, 757 A.2d 14 (2000). "When reviewing claims under an abuse of discretion standard, the unquestioned rule is that great weight is due to the action of the trial court and every reasonable presumption should be given in favor of its correctness . . . ." (Internal quotation marks omitted.) *Schilberg Integrated Metals Corp.* v. *Continental Casualty Co.*, 263 Conn. 245, 274, 819 A.2d 773 (2003).

In the present case, however, the specific issues before us are whether the attorney-client privilege protected this e-mail from disclosure, and whether, even if privileged, the crime-fraud exception applied to negate the privilege. Therefore, "[t]he scope of our appellate review depends upon the proper characterization of the rulings made by the trial court. To the extent that the trial court has made findings of fact, our review is limited to deciding whether such findings were clearly erroneous. When, however, the trial court draws conclusions of law, our review is plenary and we must decide whether its conclusions are legally and logically correct and find support in the facts that appear in the record." (Internal quotation marks omitted.) *Olson* v. *Accessory Controls & Equipment Corp.*, supra, 254

Conn. 156. We consider, therefore, the trial court's conclusions on the basis of the evidence properly presented and the permissible inferences drawn therefrom. *State* v. *Reagan*, 209 Conn. 1, 8, 546 A.2d 839 (1988).

I

We first address the petitioner's contention that the trial court improperly determined that the respondents had satisfied their burden of proving that the attorney-client privilege protected the e-mail from disclosure. Specifically, the petitioner contends that the trial court improperly relied on representations of counsel in lieu of evidence as the basis for its conclusion.[5] The peti-

[5] The trial court's specific findings of facts that the petitioner contends arose from representations by Goldman and Peter L. Costas; see footnote 4 of this opinion; include, inter alia: (1) since 1999, Goldman had represented Kimber as outside general counsel on all significant matters, including litigation; (2) since 1999, Goldman had represented Edelman and Van Brunt; and (3) prior to March 20, 2000, the date Van Brunt sent the e-mail, Edelman specifically had engaged Goldman to represent Kimber in connection with anticipated firearms litigation.

Under the facts of this case, we need not consider whether the trial court did rely on factual representations by Kimber's counsel when reaching its legal conclusions, because we conclude that there was sufficient evidence properly before the court from which the court reasonably could have reached its conclusions. We are mindful, however, because of the nature of the representations and the particular context in which these facts were put before the court, that, under these circumstances, the court reasonably might have concluded that such facts were reliable. At the hearing on this matter, the trial court engaged in a lengthy colloquy with both the petitioner and Goldman. Although neither the petitioner nor Goldman was under oath, and therefore their representations to the trial court did not comprise testimonial evidence; see *Cologne* v. *Westfarms Associates*, 197 Conn. 141, 152–53, 496 A.2d 476 (1985); both, as attorneys and officers of the court, are obligated to make truthful representations. Rules of Professional Conduct 3.3. Importantly, everything that Goldman recounted to the trial court was within his own specific knowledge; he was not making representations concerning the acts of third parties. See *Cologne* v. *Westfarms Associates*, supra, 153 (representations made by plaintiff's counsel at contempt hearing regarding actions of defendants that counsel did not witness do not constitute evidence).

We note further that the trial court's findings of fact are supported by affidavits, dated October 18, 2001, submitted by the respondents *after* the hearing on the privilege issue, in support of their motion for a protective

tioner further contends that, in the absence of these representations, the record is "devoid of . . . evidence" to establish the criteria necessary to invoke the privilege.

We agree with the petitioner that, to the extent the trial court may have relied on representations by either Goldman, in the hearing on the order of compliance, or Peter L. Costas, the respondents' local counsel, in his memorandum of law in opposition to the petitioner's motion, such reliance clearly was improper. See *Cologne* v. *Westfarms Associates*, 197 Conn. 141, 153, 496 A.2d 476 (1985). Consistent with our usual rule, however, "the trial court is presumed to have applied the law correctly, and it is the burden of the appellant to show to the contrary." *Caffe* v. *Caffe*, 240 Conn. 79, 85, 689 A.2d 468 (1997) (*Borden, J.*, concurring). Moreover, "even if the trial court record is ambiguous, we read the record to support, rather than to undermine, the judgment." Id. We disagree, therefore, in light of the evidence actually before the trial court and the deferential standard by which we review its conclusion, that the court improperly concluded that the respondents had met their burden of proving that the e-mail was privileged.[6]

"On numerous occasions we have reaffirmed the importance of the attorney-client privilege and have

order on the inadvertent disclosure issue. Consequently, this evidence was put into the record before the trial court, *Bryant, J.*, issued its memorandum of decision on the present issue on January 30, 2002. There were no affidavits in opposition submitted by the petitioner. Therefore, there is no doubt that Goldman in fact had been retained by the respondents since 1999, and that Goldman actively was involved in representing Kimber and Kimber's management team, both in their individual and corporate capacities, in matters resulting from the petitioner's investigation.

[6] Although we conclude in the present case that the trial court reasonably could have inferred, principally from the contested document itself, that the elements necessary to establish the attorney-client privilege were satisfied, in view of the deferential review that we accord the trial court's conclusions on such matters, we caution that parties would be well-advised in the future to provide *supplemental* evidence in support of the required elements.

recognized the long-standing, strong public policy of protecting attorney-client communications. . . . In Connecticut, the attorney-client privilege protects both the confidential giving of professional advice by an attorney acting in the capacity of a legal advisor to those who can act on it, as well as the giving of information to the lawyer to enable counsel to give sound and informed advice. . . . The privilege fosters full and frank communications between attorneys and their clients and thereby promote[s] the broader public interests in the observation of law and [the] administration of justice." (Citations omitted; internal quotation marks omitted.) *Olson* v. *Accessory Controls & Equipment Corp.*, supra, 254 Conn. 156–57.

"As a general rule, [c]ommunications between client and attorney are privileged when made in confidence for the purpose of seeking legal advice." (Internal quotation marks omitted.) Id., 157. "[W]here legal advice of any kind is sought from a professional legal adviser in his [or her] capacity as such, the communications relating to that purpose, made in confidence by the client, are at [the client's] instance permanently protected from disclosure by [the client] or by the legal adviser . . . ." (Internal quotation marks omitted.) *Shew* v. *Freedom of Information Commission*, supra, 245 Conn. 157.

The trial court properly noted that the common law in Connecticut has evolved and now extends the attorney-client privilege to communications when the client is a corporate entity. See id., 158. In *Shew*, this court set forth the four criteria that must be present, in the corporate context, in order for the privilege to attach: "(1) the attorney must be acting in a professional capacity for the [corporation], (2) the [communication] must be made to the attorney by current employees or officials of the [corporation], (3) the [communication] must relate to the legal advice sought by the [corporation]

from the attorney, and (4) the [communication] must be made in confidence."[7] (Internal quotation marks omitted.) Id., 159. The burden of proving each element of the privilege, by a fair preponderance of the evidence, rests with the respondents, as they are seeking to assert it. *State* v. *Hanna*, 150 Conn. 457, 466, 191 A.2d 124 (1963).

We note, as an initial matter, that the evidence before the trial court included the e-mail at issue, six other documents from various Kimber executives that addressed industry reaction to the agreement, which were disclosed in the course of discovery to the petitioner, and the stipulation of facts submitted to the court. Accordingly, we consider whether, drawing all reasonable inferences from this evidence, the trial court properly concluded that the respondents had satisfied the four prongs of the *Shew* test.

Our discussion of the first criterion is brief in light of the petitioner's concessions, both at oral argument before this court and at the hearing before the trial court, that Goldman was the respondents' outside counsel. Moreover, the trial court reasonably could have inferred, based on Goldman's appearance on behalf of Kimber at the hearing on the discovery order and his status as a recipient of the e-mail, that Goldman represented Kimber at the time Van Brunt sent the e-mail. Although the petitioner contends that the respondents

---

[7] We note that, in *Olson* v. *Accessory Controls & Equipment Corp.*, supra, 254 Conn. 147, a case in which the issue of attorney-client privilege also arose in a corporate context, we did not apply *Shew*'s four part test because that case involved a determination of whether the attorney-client privilege applied to a factual report compiled by an *outside* third party at the request of a corporation. Therefore, the analysis in that case more closely followed our line of cases that address whether the attorney-client privilege protects communications involving third parties. Id., 157–58; see *Pagano* v. *Ippoliti*, 245 Conn. 640, 649–50, 716 A.2d 848 (1998); *State* v. *Cascone*, 195 Conn. 183, 186–87, 487 A.2d 186 (1985); *State* v. *Toste*, 178 Conn. 626, 628, 424 A.2d 293 (1979); *Goddard* v. *Gardner*, 28 Conn. 172, 175 (1859).

did not present evidence that Goldman specifically represented Kimber for litigation purposes, the first prong of *Shew* merely requires a determination that the attorney was acting in a professional capacity for the corporation. *Shew* v. *Freedom of Information Commission*, supra, 245 Conn. 159. Accordingly, the trial court reasonably concluded that the first criterion had been met.

We next consider, under the second prong of the *Shew* test, whether current employees or officials of the corporate client sent the e-mail to counsel. Id. As stated previously, Van Brunt sent the e-mail to Goldman, Edelman, and Schusterman, and copied it to Busse. The stipulation indicates that Van Brunt is Kimber's vice president of marketing and that Busse is Kimber's national sales manager. It also is undisputed, as reflected in the briefs of both parties to this court, that Edelman, a respondent in the present action, is Kimber's president, and that Schusterman is Kimber's chief financial officer. Moreover, it is undisputed that all of the parties to the e-mail, except for Goldman, were employees of Kimber at the time Van Brunt sent the e-mail. Furthermore, it is evident from their positions in the corporation that these employees were members of Kimber's senior management team. Although the petitioner contends that the respondents must introduce evidence concerning the scope of these individuals' involvement in preparing for the firearms litigation, no such specificity is required under *Shew* in order to assert the attorney-client privilege.[8]

---

[8] At oral argument, the petitioner raised for the first time to this court a claim that the respondents did not introduce evidence to establish that all of the e-mail recipients, and in particular, Busse, Kimber's national sales manager, were members of the "control group." We are mindful that some other jurisdictions have engrafted an additional layer to their inquiry, beyond the general test that this court set forth in *Shew*, to identify *which* employees constitute the "corporate client" for purposes of invoking attorney-client privilege—the so-called "control group" test, which focuses on the status of the employee within the corporate hierarchy, being just one of those tests. See *Consolidated Coal Co.* v. *Bucyrus-Erie Co.*, 89 Ill. App. 2d 103, 112–17, 432 N.E.2d 250 (1982) (adopting control group test but setting forth

We next examine, under the third prong of the *Shew* test, whether the e-mail related to legal advice sought by Kimber from Goldman. Id. In order to meet that criterion, it is not required "that the [legal] advice [sought] must pertain to contemplated or pending litigation. *Brown* v. *Butler*, 71 Conn. 576, 583, 42 A. 654 (1899)." C. Tait, Connecticut Evidence (3d Ed. 2001) § 5.22.1, p. 315. Moreover, the communication need not expressly seek legal advice. See *Ullmann* v. *State*, 230 Conn. 698, 713, 647 A.2d 324 (1994) (communication from attorney to client solely regarding matter of fact is privileged if shown to be "inextricably linked" to giving of legal advice). The privilege merely requires that the client be consulting an attorney for professional advice, and "[a]ny type of legal advice will qualify . . . ." C. Tait, supra, p. 315.

We note that, in the present case, the e-mail neither expressly asked Goldman for an opinion on a legal matter, specifically raised any legal questions, nor directly referred to potential litigation. Rather, the e-mail indicated that Van Brunt had sought and received information regarding the firearms industry's initial reactions to the agreement and had forecasted potential courses of action that might be taken. Reference to the stipulation provides some context for Van Brunt's purpose in sending the e-mail. As noted previously, the stipulation indicates that most of the firearms industry opposed the agreement that Smith & Wesson had signed in an attempt to settle pending and threatened litigation;

and explaining numerous alternative approaches). We note, however, that we generally do not address a claim raised in oral argument that has not been addressed in the party's brief. *City Recycling, Inc.* v. *State*, 257 Conn. 429, 455, 778 A.2d 77 (2001); *Shew* v. *Freedom of Information Commission*, supra, 245 Conn. 166 n.20. Additionally, the petitioner has not presented the court with a persuasive rationale for departing from the *Shew* test. Accordingly, we decline the petitioner's invitation and reserve for another day the question of whether to engraft a limitation as to which particular employees constitute the corporate client.

in fact, at the time of the stipulation, Smith & Wesson was the only firearms manufacturer that had signed the agreement. Furthermore, the e-mail is dated March 20, 2000, just three days after the agreement had been announced.

From these facts, and from the existence of the Smith & Wesson agreement as a settlement against litigation, the trial court reasonably could have inferred that Kimber, a firearms manufacturer, was anticipating the threat of similar litigation. Moreover, the trial court reasonably could have found that Van Brunt had provided the information to Goldman so that he could discern the agreement's potential impact on Kimber and advise Kimber on how to respond to, or even mitigate, the agreement's effect on them. For example, the industry's reaction to the agreement could be significant as to whether Goldman might recommend that Kimber consider a similar settlement should it be named in the firearms litigation. Indeed, although the law does not require that the legal advice concern pending litigation in order to be protected by the privilege; *Brown* v. *Butler*, supra, 71 Conn. 583; when there is a credible basis to believe that such a threat exists, and the client provides information to his attorney relating to that subject matter, the trial court reasonably can infer that the client provided the information for the purpose of seeking legal advice.

Nevertheless, the petitioner contends that the communication does not relate to legal advice sought, but merely is informational. We disagree. As we previously noted, the privilege extends to "the giving of information to the lawyer to enable counsel to give sound and informed [legal] advice. *Shew* v. *Freedom of Information Commission*, supra, 245 Conn. 157, citing *Upjohn Co.* v. *United States*, 449 U.S. 383, 390, 101 S. Ct. 677, 66 L. Ed. 2d 584 (1981)." *Metropolitan Life Ins. Co.* v. *Aetna Casualty & Surety Co.*, 249 Conn. 36, 52, 730

A.2d 51 (1999). As this court long has recognized, "[i]t is obvious that professional assistance would be of little or no avail to the client, unless his legal adviser were put in possession of all the facts relating to the subject matter of inquiry or litigation, which, in the indulgence of the fullest confidence, the client could communicate. And it is equally obvious that there would be an end to all confidence between the client and [the] attorney, if the latter was at liberty or compellable to disclose the facts of which he had thus obtained possession . . . . *Goddard* v. *Garner*, 28 Conn. 172, 174 (1859)." (Internal quotation marks omitted.) *Metropolitan Life Ins. Co.* v. *Aetna Casualty & Surety Co.*, supra, 52. Therefore, we conclude that the trial court reasonably concluded that the communication related to legal advice sought by the respondents.

Finally, turning to the fourth prong, *Shew* requires the communications to have been made in confidence. *Shew* v. *Freedom of Information Commission*, supra, 245 Conn. 159. Whether a document expressly is marked as "confidential" is not dispositive, but is merely one factor a court may consider in determining confidentiality. See *Cadlerock Properties Joint Venture, L.P.* v. *Commissioner of Environmental Protection*, 253 Conn. 661, 675 n.13, 757 A.2d 1 (2000), cert. denied, 531 U.S. 1148, 121 S. Ct. 1089, 148 L. Ed. 2d 963 (2001) (holding document marked "confidential" *not* protected by privilege). Indeed, our review of the case law indicates that confidentiality principally is at issue when persons other than the attorney and the client are parties to the communication. See, e.g., *Pagano* v. *Ippoliti*, 245 Conn. 640, 649–50, 716 A.2d 848 (1998) (two persons present while consulting same attorney on matter of joint interest); *State* v. *Gordon*, 197 Conn. 413, 423–24, 504 A.2d 1020 (1985) (spouse not active in development of legal strategy present); *State* v. *Hanna*, supra, 150 Conn. 465 (statement made through agent); *Goddard*

v. *Gardner*, supra, 28 Conn. 175–76 (attorney's son present). That is not the circumstance in the present case. Instead, Van Brunt sent the e-mail to three Kimber executives, who, in accordance with our conclusion with respect to prong two, constitute the corporate client. The trial court reasonably found that the "exclusivity and limited number of distributees signifies that the Van Brunt e-mail was intended to be confidential."[9]

Nevertheless, the petitioner contends that the *subject matter* of the e-mail—an "update" on industry reaction to the Smith & Wesson agreement—was not regarded by the respondents as a confidential subject because subsequent similar "updates" were distributed outside of the corporation. We are not persuaded by this contention, as we never have analyzed the attachment of the attorney-client privilege under such a broad subject matter rubric, nor does the petitioner cite authority for such an approach. Moreover, the trial court found that the other documents to which the petitioner refers clearly are distinguishable from the e-mail at issue. These other documents all propose or advocate certain actions or report on specific actions taken by others in the industry, whereas the e-mail in question does not. Instead, the e-mail reflects Van Brunt's uncertainty concerning both the potential impact the agreement might have on the industry, and how firearms manufacturers might respond to the agreement. Of course, the trial court was not required to draw the inference that the petitioner seeks. See *Leonard* v. *Commissioner of Revenue Services*, 264 Conn. 286, 306, 823 A.2d 1184 (2003) (adverse inference from evidence permissive, not mandatory).

---

[9] The petitioner contends that the fact that other Kimber employees who are not lawyers also were recipients of the e-mail indicates that the e-mail was not intended to be confidential. The petitioner, however, offers no legal support for this proposition, and we are not aware of any. Accordingly, we reject this contention.

Additionally, the petitioner claims that, by extending the privilege to a document containing business updates that is addressed to both corporate employees and counsel, we will open the door to allow corporate defendants to cloak internal communications in attorney-client privilege merely by including a lawyer among the document recipients. The petitioner's concern is unfounded. This court has established a four part test that must be satisfied before a corporate client successfully may invoke the privilege. *Shew* v. *Freedom of Information Commission,* supra, 245 Conn. 159. Nothing the court decides today would allow a single factor—the fact that the communication was sent to an attorney, as well as to others—to undermine this four part inquiry. Moreover, we do not agree that, in the present case, Van Brunt simply appended Goldman's name to this document. As we previously stated, the trial court reasonably found that Van Brunt had sent the confidential information contained in the e-mail to Goldman to assist Goldman in providing legal advice to Kimber. Therefore, reviewing the evidence before the trial court in the light most favorable to supporting its conclusions, we conclude that the trial court properly determined that the respondents had satisfied their burden of proving that the privilege insulated the e-mail from disclosure.[10]

## II

We next turn to the petitioner's second claim that, even if we were to assume that the privilege generally

[10] The petitioner cites *North Carolina Electric Membership Corp.* v. *Carolina Power & Light Co.,* 110 F.R.D. 511 (M.D.N.C. 1986), as being directly on point with the present case. In that case, the trial court, applying the federal common law, concluded that several documents not marked "confidential" that were in the nature of updates on business developments and that contained no specific requests for legal advice were not protected under attorney-client privilege. Id., 516–17. The petitioner, in effect, is asking us to conclude as a matter of law that the trial court in this case was required to make this same determination. As we noted previously, however, we apply a deferential standard when reviewing a trial court's conclusion regarding

applied, the trial court improperly determined that the e-mail was not subject to disclosure under the crime-fraud exception to the attorney-client privilege. Specifically, the petitioner contends that other documents submitted as exhibits to the trial court provide probable cause to believe that the respondents engaged in an unlawful boycott of Smith & Wesson and that the e-mail was in direct furtherance of the boycott. We conclude that the trial court properly concluded that the e-mail did not fall under the crime-fraud exception.

As an initial matter, we note that "[e]xceptions to the attorney-client privilege should be made only when the reason for disclosure outweighs the potential chilling of essential communications." *Metropolitan Life Ins. Co.* v. *Aetna Casualty & Surety Co.*, supra, 249 Conn. 52. The crime-fraud exception to the attorney-client privilege, therefore, is a limited one, and the burden of proof is on the party seeking to pierce the privilege. *Olson* v. *Accessory Controls & Equipment Corp.*, supra, 254 Conn. 172. We also recognize, however, "that since the [attorney-client] privilege has the effect of withholding relevant information from the factfinder, it applies only where necessary to achieve its purpose." *Shew* v. *Freedom of Information Commission*, supra, 245 Conn. 157. In *Olson* v. *Accessory Controls & Equipment Corp.*, supra, 173–76, we set forth the proper inquiry for determining when the crime-fraud exception extinguishes the attorney-client privilege. The exception applies only after a determination by the trial court "that there is probable cause to believe that a crime or fraud has been attempted or committed and that the [communication was] in furtherance thereof." (Internal quotation marks omitted.) Id., 173.

Probable cause "requir[es] that a prudent person have a reasonable basis to suspect the perpetration or

discovery orders, viewing the evidence in the light most favorable to sustaining its conclusion.

attempted perpetration of a crime or fraud, and that the [communication was] in furtherance thereof." (Internal quotation marks omitted.) Id., 174. "[T]he appropriate inquiry under the probable cause standard targets the client's intent in obtaining legal advice; only if there is probable cause to believe that the client intended to perpetrate a [crime or] fraud does the exception properly come to bear." Id. We have explained that, "[w]ithout reference to intent, the [attorney-client] privilege would be pierced whenever [probable cause] could be made that an illegal act occurred after the client conferred with an attorney—even if the consultation was part of a good-faith attempt to follow the law . . . . Good-faith consultations with attorneys by clients who are uncertain about the legal implications of a proposed course of action [however] are entitled to the protection of the privilege, even if that action should later be held improper." (Citations omitted; internal quotation marks omitted.) Id., 175.

We note that, in the present case, the trial court did not determine specifically whether the petitioner had met this probable cause requirement.[11] Even if we were

---

[11] The petitioner contends that the trial court "inappropriately merged" the two distinct inquiries of whether Van Brunt sent the e-mail for the purpose of seeking legal advice, which is relevant to the question of whether the privilege applies in the first place, and whether he sent the e-mail in furtherance of a crime, which is relevant to the question of whether the e-mail must be disclosed under the exception. Therefore, the petitioner contends that the trial court improperly found that, because Van Brunt had sent the e-mail for the purpose of obtaining legal advice, he necessarily could not have sent it in furtherance of a crime. We disagree with the petitioner's interpretation of the basis for the trial court's determination. Although the trial court subsumed its analysis of whether the e-mail was sent in furtherance of a crime within its discussion of the third prong of the privilege test, it separately addressed the crime-fraud exception and explained why it was inapplicable. Specifically, the court stated that, "the Van Brunt e-mail contains no statement suggesting [an] intent to break the law. [It] is merely a report of what has happened and a prediction that some unidentified things may happen in the future and is not a communication made in furtherance of a crime." Accordingly, we reject the petitioner's contention.

to assume, however, that there was probable cause to believe that the respondents had committed or intended to commit a crime by engaging in an economic boycott in violation of antitrust law, we nevertheless conclude that the petitioner failed to meet his burden of proof.

In addition to probable cause, the crime-fraud exception is limited by a second requirement that the communication sought in discovery was made in furtherance of that unlawful act. Id., 173. "[T]he crime-fraud exception does not apply simply because privileged communications would provide an adversary with evidence of a crime or fraud. . . . Mere relevance is insufficient; there must be a showing that the communications at issue were made with an intent to further an unlawful act." (Citation omitted; internal quotation marks omitted.) Id., 176.

Our analysis as to the "in furtherance" requirement is informed largely by our reasoning in part I of this opinion. As we previously stated, the trial court reasonably could have found that the e-mail concerned matters involving the agreement by a major firearms manufacturer seeking to avoid litigation, and how that agreement, along with the litigation that gave rise to it, similarly might affect the respondents. Moreover, the e-mail reveals nothing that suggests an intent to break the law. Indeed, we agree with the trial court's determination that the critical statements at issue are "not words of advocacy, but, rather, statements of fact or impression." Furthermore, to the extent that the e-mail refers to any action, it is the actions of others, and not of the respondents; it neither advocates that Kimber take any action of its own, nor that others take a particular action. The evidence does not support a conclusion that the respondents sent the e-mail with the intent to further a fraud or crime. Rather, as the trial court reasonably concluded, it was intended to keep Goldman informed so that he could provide them with sound

legal advice. Accordingly, the injury that would inure to the relationship of Kimber and its attorneys by disclosure of the e-mail is greater than the benefit that would be gained by its disclosure to the petitioner. *State* v. *Cascone*, 195 Conn. 183, 189, 487 A.2d 186 (1985).

Therefore, we conclude that the trial court properly concluded that the e-mail is not subject to disclosure under the crime-fraud exception to the attorney-client privilege.

The decision is affirmed.

In this opinion the other justices concurred.