PAULA J. FISH *v.* ANDREW J. FISH, JR.
(AC 24542)

DiPentima, McLachlan and Foti, Js.

Argued March 28—officially released August 16, 2005

*Louis Kiefer*, for the appellant (defendant).

*Robert J. Kor* and *Emily J. Moskowitz*, for the minor child.

*Opinion*

McLACHLAN, J. In this postdissolution child custody matter, the defendant, Andrew J. Fish, Jr., appeals from the orders of the trial court modifying the judgment of child custody. The court awarded joint custody of the parties' minor child to the plaintiff, Paula J. Fish, now known as Paula J. Pierce,[1] and the child's paternal aunt, intervenor Barbara Husaluk, and ordered that the child reside primarily with Husaluk in Aspen, Colorado. The defendant claims on appeal that the court (1) lacked jurisdiction to grant Husaluk's motion to intervene where she failed to allege the minimum facts as required by *Roth* v. *Weston*, 259 Conn. 202, 234–35, 789 A.2d 431 (2002), (2) improperly awarded custody to Husaluk where she failed to prove by clear and convincing evidence the facts required by *Roth* for third party visitation, (3) lacked statutory authority to award joint custody to a parent and to a nonparent where both

---

[1] The plaintiff did not submit a brief to this court. The guardian ad litem-attorney for the minor child submitted the only appellee's brief contesting most of the defendant's claims on appeal. The brief takes no position on the issues regarding tax dependency exemptions and the protective order.

parents did not consent, (4) improperly granted custody to Husaluk and to the plaintiff when neither filed a pleading setting forth a claim for relief until the fifth day of a seven day trial, (5) improperly appointed the child's guardian ad litem for the four years following the judgment "should any issues arise," (6) lacked authority to allocate the tax dependency exemptions where no pleading had been filed seeking a modification of judgment addressing the allocation of the exemption, (7) abused its discretion in allocating the tax dependency exemptions and (8) improperly issued a protective order prohibiting the defendant from obtaining the plaintiff's medical records. We reverse in part and affirm in part the judgment of the trial court.

The parties were married on June 21, 1985, and a child was born of the marriage in 1989. The marriage was dissolved on March 5, 1996, after which the parties shared joint custody of the child with an evenly divided parenting arrangement. There have been frequent contentious disputes with respect to the child's educational placement and the payment of tuition and child support. In June, 2001, a guardian ad litem was appointed for the child, and she continues to serve in that capacity as well as serving as the child's attorney since December, 2002.[2]

In May, 2002, the defendant instituted this action by filing a motion to modify custody in which he sought sole custody of the child with supervised visitation by the plaintiff. The court entered orders for a custody evaluation and ordered that the child live for the remainder of the school year with her maternal aunt, Pamela Martinsen, who lives in Connecticut. The court also

---

[2] All references to the guardian ad litem are likewise references to the attorney for the minor child as they are the same person.

ordered that the child spend the summer of 2002 in Aspen, Colorado, with her paternal aunt, Husaluk. In early December, 2002, there was another flurry of activity involving custody and visitation. The court ordered the temporary placement of the child with Martinsen and unsupervised weekend visitation by the parties on rotating weekends. Four days later, following an emergency request by the guardian ad litem, the court modified the visitation order to reflect that the child could elect the extent and the circumstances of her visitation with the defendant.

Trial in this matter began on December 13, 2002, and continued on March 3, April 21, May 12, 19 and 29, and July 8, 2003. During the course of the trial, the guardian ad litem recommended that custody and placement of the child with Husaluk in Aspen, Colorado, would be in the child's best interest. The plaintiff, who had had a double mastectomy and was undergoing chemotherapy to treat her breast cancer throughout the trial, agreed with the guardian ad litem's proposed orders. Both Husaluk and Martinsen filed motions to intervene during the course of the trial, which the court granted. Following trial, the court ordered, inter alia, that Husaluk and the plaintiff share joint custody of the child, with the child's primary residence in Aspen, Colorado, with Husaluk during her high school years, which were about to commence. The court ordered visitation with each of the parties during school vacations, but specifically gave the child the choice of whether to spend overnight visits with the defendant. The court ordered that the guardian ad litem remain appointed to the child for four years "should any issues arise . . . ."

With respect to the custody of the child and its reasons for awarding joint custody to the plaintiff and

Husaluk, the court made exhaustive findings of fact, which we excerpt and summarize from its August 1, 2003 memorandum of decision. Since the dissolution of the parties' marriage when the child was four years old, "she has been the subject of an intense battle between the two parents over their ownership rights in her. She has, by her own account, constantly been 'put in the middle,' has been incessantly grilled by each parent after time spent with the other and has been bombarded by what she calls 'guilt bombs' from each parent."

The court found that both parties had put their own interests before the child's well-being. In addition, the court found that the defendant had failed to provide a clean and appropriate home for the child, demonstrated inappropriate behavior of a sexual nature in the child's presence, kept a dangerous dog in his home and, in sum, had emotionally neglected the child. The court stated: "In the plaintiff's home, [the child] has had to endure her mother's attempts to make her feel guilty over the time spent at the defendant's home. In the defendant's home, she has had to deal with her father's incessant attempts to get her to his side. At his house, she also has been exposed to a filthy and unkempt environment, with multiple cats, cat feces and urine odors throughout the home."

The court also found that there was a history of conflict between the child and the defendant, and a history of inappropriate behavior by the defendant toward the child. For example, the court credited the child's testimony that the defendant walked around the house with an open bathrobe exposing his genitals in her presence and that he joked about going to a nudist colony with her. The defendant also made other inap-

propriate and suggestive comments, including once suggesting at a mall that she wear a "see-through outfit." The child also testified that the defendant, when angered, lost control of himself entirely, striking himself and running up and down stairs. She also testified that the defendant drank wine almost every day and that alcohol rendered his moods unpredictable. The child was adamant in her desire not to stay at the defendant's house overnight and expressed no desire to live with him.

The court also found that after living with Martinsen and, later, Husaluk, the child had been away from her parents' battles and had seen how other people live in relative peace and in a supportive and nurturing environment. Those experiences increased the child's yearning for stability and calm in her family life, which she never had enjoyed with her parents. The court noted that, "[m]ost compelling, at one point during her testimony, the child asked the court to please emancipate her." The child's aunts, Martinsen and Husaluk, impressed the court as loving and nurturing women who have helped the child "develop a voice for herself," which she had lacked while in her parents' care. Martinsen, Husaluk, the plaintiff, the child and the guardian ad litem agreed that it was in the child's best interest that she live with Husaluk in Aspen.[3] While in Aspen the previous summer, the child thrived, working at the Husaluk family business, participating in sports and making new friends. The defendant, in contrast to the child's aunts, refused to pay for the child's airplane ticket for her trip home because the child had refused to stay overnight at his house. Husaluk paid for the ticket.

The court credited the testimony of John Herd, a teacher and administrator at the child's school in Con-

---

[3] Martinsen's husband had been seriously ill, which would have made it more difficult for Martinsen to care for the child.

necticut, who testified that after returning from Aspen, the child's emotional state and the quality of her work in school improved. James Black, a child and adolescent psychiatrist who conducted an evaluation of the child and the parties, also recommended that the child return to Aspen to reside with Husaluk. Black testified that moving to Aspen would be the only thing that could insulate the child from the conflict that the parties have continued to wage and that, in all of his years of practice, he never had recommended sending a child away from her parents. Black recommended that it would be better for the child's development for her to stay with Husaluk with joint custody with the plaintiff than for her to attend a boarding school or to enter foster care, each of which the defendant had suggested.

The court concluded that "[i]t is clear . . . that there exists a deep antagonism between the two parents that has little to do with [the child], which has caused them to place their own needs ahead of their daughter's. However, since the start of this case, the plaintiff's relationship with her daughter has improved considerably. She has come to realize that her daughter's placement with [Husaluk] in Colorado for the next four years of high school is in the child's best interest. Unfortunately, the same cannot be said of the defendant. He is a controlling individual who believes that he is the only one qualified to decide what is in [the child's] best interest. . . . [H]e is incapable of working with the [plaintiff] or either of the aunts, including his own sister [Husaluk], to promote the child's best interest. . . . It is clear to this court that this child has been emotionally neglected by the defendant. He has had many opportunities and ample time to improve the condition of his home and has chosen not to. . . . The defendant does not hear his daughter and gives little credence to her opinions, ideas and needs. The court is persuaded that

this fourteen year old is quite capable of making an intelligent, well thought out decision with respect to her living situation."

I

We address together the defendant's first two enumerated claims, as they are closely related. The defendant first claims that the court lacked subject matter jurisdiction over Husaluk's motion to intervene in the contested child custody hearing because she failed to allege the minimum facts required to overcome the jurisdictional hurdle that the defendant argues is imposed by our Supreme Court's decision in *Roth* v. *Weston*, supra, 259 Conn. 234–35. He next claims that the court improperly awarded custody to Husaluk where she failed to prove by clear and convincing evidence the facts required by *Roth* to sustain a third party's petition for visitation of a child over the objection of a fit parent. The defendant's principal argument is, in essence, that the heightened jurisdictional pleading requirements and burden of persuasion of *Roth* necessarily apply to a case of a third party's petition for child *custody* as well as to a third party's petition for child *visitation* because a third party taking custody of a child is at least as intrusive as an application seeking visitation with the child. We conclude that, while the defendant enjoys the rights of a parent recognized in *Roth* and other cases, the jurisdictional pleading requirements and heightened burden of persuasion of *Roth*, which are specific to cases involving third party petitions for visitation over the objection of a fit parent, are inapposite to this contested custody case, which was initiated by the defendant's motion to modify custody. Thus, the court properly applied the statutory standards governing third party intervention and cus-

tody. See General Statutes §§ 46b-57,[4] 46b-56[5] and 46b-56b.[6]

At trial on the defendant's motion to modify, the guardian ad litem submitted proposed orders. The orders proposed that the child be placed in the custody of Husaluk and the parties, and that the child's primary residence be with Husaluk during the school year. Thereafter, Husaluk filed pro se a motion to intervene on May 1, 2003, between the third and fourth days of

[1] General Statutes § 46b-57 provides: "In any controversy before the Superior Court as to the custody of minor children, and on any complaint under this chapter or section 46b-1 or 51-348a, if there is any minor child of either or both parties, the court, if it has jurisdiction under the provisions of chapter 815p, may allow any interested third party or parties to intervene upon motion. The court may award full or partial custody, care, education and visitation rights of such child to any such third party upon such conditions and limitations as it deems equitable. Before allowing any such intervention, the court may appoint counsel for the child or children pursuant to the provisions of section 46b-54. In making any order under this section, the court shall be guided by the best interests of the child, giving consideration to the wishes of the child if the child is of sufficient age and capable of forming an intelligent preference."

[5] General Statutes § 46b-56 provides in relevant part: "(a) In any controversy before the Superior Court as to the custody or care of minor children, and at any time after the return day of any complaint under section 46b-45, the court may at any time make or modify any proper order regarding the education and support of the children and of care, custody and visitation if it has jurisdiction under the provisions of chapter 815p. Subject to the provisions of section 46b-56a, the court may assign the custody of any child to the parents jointly, to either parent or to a third party, according to its best judgment upon the facts of the case and subject to such conditions and limitations as it deems equitable. The court may also make any order granting the right of visitation of any child to a third party, including, but not limited to, grandparents.

"(b) In making or modifying any order with respect to custody or visitation, the court shall (1) be guided by the best interests of the child, giving consideration to the wishes of the child if the child is of sufficient age and capable of forming an intelligent preference . . . ."

[6] General Statutes § 46b-56b provides: "In any dispute as to the custody of a minor child involving a parent and a nonparent, there shall be a presumption that it is in the best interest of the child to be in the custody of the parent, which presumption may be rebutted by showing that it would be detrimental to the child to permit the parent to have custody."

a seven day trial held over a period of several months. The motion to intervene stated: "I am the paternal aunt of the minor child. . . . By order of the court, [the child] resided with me during the summer of 2002. . . . I have maintained contact with [the child] throughout this school year. . . . [The child] spent her spring vacation with me, as ordered by the court. . . . I provide a safe and loving environment . . . for [the child]. . . . It is [the child's desire] to reside with me through her high school year[s]. Wherefore, I ask that the court grant me permission to intervene." Martinsen also filed a motion to intervene. The court granted both motions. The defendant claims that the court lacked subject matter jurisdiction to grant Husaluk's motion to intervene and improperly failed to apply the clear and convincing burden of persuasion.

Our review of a court's determination of its subject matter jurisdiction is plenary, as subject matter jurisdiction involves a question of law. *In re Shawn S.*, 262 Conn. 155, 164, 810 A.2d 799 (2002). A court's determination of the proper legal standard also is a question of law subject to plenary review. *Hartford Courant Co. v. Freedom of Information Commission*, 261 Conn. 86, 96–97, 801 A.2d 759 (2002).

There are three statutory provisions that govern a motion to intervene filed by a third party in a contested child custody matter. Section 46b-57 allows the court to grant a motion to intervene filed by an interested third party and to award a third party full or partial custody of a child. See footnote 4. Section 46b-56 allows the court, in a postdissolution case, to make or to modify a custody order at any time and allows an order of custody to a third party. See footnote 5. Each directs the court to order custody according to the best interest of the child and to give consideration to the wishes of the child if she is old enough and capable of forming a preference. Section 46b-56b allows a court to award

custody to a third party on a showing that it would be detrimental to the child to permit the parent to have custody. See footnote 6. The court applied those statutes in reaching its decision regarding the child's custody.

We now consider whether, under *Roth* v. *Weston*, supra, 259 Conn. 234–35, the court was required to apply, in addition to those statutory provisions, a heightened jurisdictional pleading requirement and burden of persuasion. We conclude that it was not.

In *Roth*, our Supreme Court announced the requirements that must be satisfied, under the fifth and fourteenth amendments to the constitution of the United States and article first, § 8, of the constitution of Connecticut, for a court, first, to exercise jurisdiction over a petition for third party visitation contrary to the wishes of a fit parent, and second, to grant such a petition. "First, the petition must contain specific, good faith allegations that the petitioner has a relationship with the child that is similar in nature to a parent-child relationship. The petition must also contain specific, good faith allegations that denial of the visitation will cause real and significant harm to the child. As [our Supreme Court has] stated, that degree of harm requires more than a determination that visitation would be in the child's best interest. It must be a degree of harm analogous to the kind of harm contemplated by [General Statutes] §§ 46b-120 and 46b-129, namely, that the child is 'neglected, uncared-for or dependent.' The degree of specificity of the allegations must be sufficient to justify requiring the fit parent to subject his or her parental judgment to unwanted litigation. Only if these specific, good faith allegations are made will a court have jurisdiction over the petition.

"Second, once these high jurisdictional hurdles have been overcome, the petitioner must prove these allega-

tions by clear and convincing evidence. Only if that enhanced burden of persuasion has been met may the court enter an order of visitation. These requirements thus serve as the constitutionally mandated safeguards against unwarranted intrusions into a parent's authority." *Roth* v. *Weston*, supra, 259 Conn. 234–35.

The defendant argues that the *Roth* requirements apply in this case because a third party filed a motion to intervene in a child custody dispute with a parent. He raises the due process right of parents recognized on several occasions by our Supreme Court and the United States Supreme Court to make decisions concerning the care, custody and control of their children. See, e.g., *Troxel* v. *Granville*, 530 U.S. 57, 75, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000); *In re Juvenile Appeal (83-CD)*, 189 Conn. 276, 284, 455 A.2d 1313 (1983). The defendant, however, offers no support for his assertion that the specific requirements of *Roth* apply to a § 46b-57 third party motion to intervene. Moreover, the defendant does not challenge the constitutionality of either §§ 46b-57 or 46b-56, as was the case in *Roth* with General Statutes § 46b-59. In fact, our Supreme Court in *Roth* imposed the additional requirements instead of invalidating the statute. Our Supreme Court has not held unconstitutional either of the relevant statutory provisions here, nor has it held that the *Roth* requirements apply in any situation other than that of a third party petition for visitation over the objection of a fit parent.

Additionally, the concerns behind the decision in *Roth* are not present here. There, the question was under what circumstances a fit parent should be forced to submit to a court's jurisdiction to defend against another's petition for visitation against the fit parent's wishes. The paramount concern of the court in *Roth* was the right of a fit parent to raise a child free of interference by the state and nonparents. "In light of the compelling interest at stake, the best interests of

the child are secondary to the parents' rights." *Roth v. Weston,* supra, 259 Conn. 223. Here, the defendant initiated the proceeding by seeking sole custody of the child after having shared custody previously with the plaintiff. The child, however, wanted to live with her aunt in Colorado, and the court agreed with the child that it was in her best interest to do so. "The paramount concern in awarding custody is the best interest of the child." *Emerick v. Emerick,* 5 Conn. App. 649, 659, 502 A.2d 933 (1985), cert. dismissed, 200 Conn. 804, 510 A.2d 192 (1986).

There is no question that the defendant, as a father, enjoys due process protection in disputes over the custody of the child. Our legislature has recognized as much in enacting § 46b-56b, which creates a rebuttable presumption that, in custody disputes between a parent and a nonparent, it is in the best interest of the child to be in the custody of the parent. See footnote 6. Given the court's findings of fact as reported previously, however, there was ample evidence for the court to conclude that the presumption in the defendant's favor was rebutted.

We accordingly conclude that the court properly refused to apply the *Roth* jurisdictional requirements in this case and properly refused to require that Husaluk prove the *Roth* factors by clear and convincing evidence.[7]

## II

The defendant next claims that the court improperly granted custody of the child to a parent and nonparent without the consent of the noncustodial parent, in this case, the defendant. The defendant argues that General

---

[7] We note that our courts have held that the burden of proof for the state to take custody of a neglected or abused child pursuant to General Statutes § 46b-129 (b) (2) is a fair preponderance of the evidence. *In re Juvenile Appeal (83-CD),* supra, 189 Conn. 295.

Statutes § 46b-56a requires the consent of both parents for a court to award joint custody and, moreover, limits the court's authority to award joint custody to orders granting joint custody to parents, not to a parent and a third party. The guardian ad litem responds that § 46b-56a does not apply to this case because it refers only to joint custody among parents and places no limit on the court's authority in this situation. We agree with the guardian ad litem.

This claim raises a question of statutory construction over which we exercise plenary review. *State* v. *Kirk R.*, 271 Conn. 499, 510, 857 A.2d 908 (2004). Likewise, the applicability of a statute to a given set of facts and circumstances is a question of law subject to plenary review. *Commissioner of Social Services* v. *Smith*, 265 Conn. 723, 734, 830 A.2d 228 (2003).

Section 46b-56a provides in relevant part: "(a) For the purposes of this section, 'joint custody' means an order awarding legal custody of the minor child to both parents, providing for joint decision-making by the parents and providing that physical custody shall be shared by the parents in such a way as to assure the child of continuing contact with both parents. The court may award joint legal custody without awarding joint physical custody where the parents have agreed to merely joint legal custody.

"(b) There shall be a presumption, affecting the burden of proof, that joint custody is in the best interests of a minor child where the parents have agreed to an award of joint custody or so agree in open court at a hearing for the purpose of determining the custody of the minor child or children of the marriage. If the court declines to enter an order awarding joint custody pursuant to this subsection, the court shall state in its decision the reasons for denial of an award of joint custody . . . ."

By its literal terms, the definition of joint custody found in § 46b-56a (a) is limited to "the purposes of this section," and applies only where the parents are the sole petitioners for custody of the child or children. To hold otherwise would render meaningless the portion of § 46b-57 that allows a court to order joint custody to a nonparent, which states that "[t]he court may award full or partial custody, care, education and visitation rights of such child to any such third party upon such conditions and limitations as it deems equitable. . . ." General Statutes § 46b-57. Furthermore, § 46b-56a (b) does not apply because the parents did not agree to joint custody, but rather, the defendant filed a motion for modification seeking sole custody of the child. Moreover, the agreement to share joint custody that is contemplated by the statute is the agreement of both parents to share joint custody together. Thus, the non-custodial parent's consent is not required in this situation.

### III

The defendant next claims that the court improperly entered its order of custody where the plaintiff and Husaluk failed to file a pleading setting forth a claim for relief until the fifth day of trial. The defendant argues that he received inadequate notice to satisfy due process that the plaintiff and Husaluk were seeking joint custody of the child. We disagree.

"Notice of the identity of those who are the contenders for the custody of a child is not a mere formality. The award of custody requires the trial court to make difficult and sensitive inquiries into the relationships between adults and children. In the search for an appropriate custodial placement, the primary focus of the court is the best interests of the child, the child's interest in sustained growth, development, well-being, and in the continuity and stability of its environment. . . .

Such a search requires the court to afford all interested parties an opportunity for a hearing concerning the qualifications of each person who is or may be a candidate for custody. It is essential to inquire into each person's parenting skills as well as his or her relationship with the child. . . . [B]efore a parent is permanently deprived of the custody of a child, the usual and ordinary procedures of a proper and orderly hearing must be observed." (Citations omitted; internal quotation marks omitted.) *Cappetta* v. *Cappetta*, 196 Conn. 10, 16–17, 490 A.2d 996 (1985).

The possibility of placing the child in Husaluk's physical custody first was brought before the court on the second day of trial, March 3, 2003, when Black, the psychiatrist, testified as to his recommendations. Thereafter, the guardian ad litem made the same recommendation, and the child, the plaintiff, Husaluk and Martinsen all testified that Black's recommended custody arrangement was in the child's best interest. Husaluk filed her motion to intervene on May 1, 2003, prior to the fourth day of trial. The seventh, and final, day of trial was July 8, 2003. In its articulation, the court stated that "the defendant was provided sufficient notice that custody might be awarded jointly to the plaintiff and one of the aunts. . . . The consensus [from] the testimony received by the court, notwithstanding the defendant's testimony, was that joint custody with the paternal aunt and the plaintiff was in [the child's] best interest."

The defendant had at least four months prior to the conclusion of the trial during which he was aware that the court was considering the possibility of awarding custody to Husaluk. Moreover, the court had placed the child with both Husaluk and Martinsen prior to the commencement of trial. We conclude that the actual notice that the defendant received outweighs the relative tardiness of a formal pleading requesting what the

court already had been considering. The defendant, moreover, had initiated the proceeding and presumably already had prepared his position on the issue of custody, namely, that it was in the child's best interest that she be placed in the defendant's sole custody. The defendant cannot reasonably argue that his motion for modification of custody did not open the door to the court examining all petitions for custody or to its placement of the child with a relative. The defendant received notice of Husaluk's candidacy for custody that was adequate to satisfy due process.

## IV

The defendant next claims that the court improperly extended the appointment of the guardian ad litem for the child's high school years, "should any issues arise."[8] He argues that the court exceeded its authority under General Statutes § 45a-132[9] by extending the appointment of the guardian ad litem beyond the duration of the custody proceedings. He also points out that an attorney's appearance automatically expires 180 days after a proceeding ends. Practice Book § 3-9 (c). We conclude that the court acted within its discretion.

"An appellate court will not disturb a trial court's orders in domestic relations cases unless the court has abused its discretion or it is found that it could not

---

[8] The defendant also claims that "to appoint a guardian ad litem to represent a child when there are no proceedings existing appears to be an unconstitutional infringement of the rights of both parents." The defendant provides no support for or analysis of this assertion and, as such, we do not afford it review.

[9] General Statutes § 45a-132 provides in relevant part: "Appointment of guardian ad litem for minors . . . . (a) In any proceeding . . . the judge . . . may appoint a guardian ad litem for any minor . . . .

"(b) The appointment shall not be mandatory, but shall be within the discretion of the judge . . . .

"(f) The guardian ad litem may be removed by the judge . . . which appointed him . . whenever it appears to the judge . . . to be in the best interests of the ward or wards of the guardian. . . ."

reasonably conclude as it did, based on the facts presented. . . . In determining whether a trial court has abused its broad discretion in domestic relations matters, we allow every reasonable presumption in favor of the correctness of its action. . . . Appellate review of a trial court's findings of fact is governed by the clearly erroneous standard of review. The trial court's findings are binding on this court unless they are clearly erroneous in light of the evidence and the pleadings in the record as a whole. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence in the record to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . Therefore, to conclude that the trial court abused its discretion, we must find that the court either incorrectly applied the law or could not reasonably conclude as it did." (Citation omitted; internal quotation marks omitted.) *Lamacchia* v. *Chilinsky*, 79 Conn. App. 372, 375, 830 A.2d 329 (2003).

Section 45a-132 (f) allows the court to remove the guardian ad litem according to the best interest of the child. See footnote 9. The court in this case clearly anticipated the likelihood of contention in the scheduling of visitation. It noted in its memorandum of decision that "[t]he child's needs and wishes should be given first consideration in implementing this schedule." It is a sound exercise of the court's discretion in high conflict custody disputes to have the guardian ad litem remain appointed on a kind of standby basis to aid in the implementation of court orders even after the specific proceedings have closed. The breadth of the statutory language, which allows a court to remove a guardian ad litem "whenever it appears to the judge . . . to be in the best interests" of the child; General

Statutes § 45a-132 (f); satisfies us that the court acted within its broad discretion.

V

The defendant next claims that the court improperly ordered the allocation of tax dependency exemptions where no pleading set forth a claim for such relief. In the alternative, the defendant claims that, if the court had authority to do so, it nevertheless abused its discretion in so doing. We agree that the court improperly ordered the allocation of the tax dependency exemption in the absence of a pleading demanding such relief and before the entry of child support orders and, thus, do not consider whether the court properly balanced the equities in its allocation.

The court, in its memorandum of decision, issued the following order: "The plaintiff and the defendant shall alternate the income tax deduction for the minor child. [The year 2004] shall be the defendant's deduction [year]. Should the child attend college, each parent shall be entitled to the alternate year exemption only if a parent is contributing a reasonable amount toward the college expenses." The court did not enter orders concerning the parties' payment of child support to Husaluk. It held over that issue for a later hearing, the result of which, if any, is not a part of the record in this appeal. The defendant argues that had any party raised the issue of the tax dependency exemption, he could have offered evidence of the ramifications of the allocation of the exemption. Additionally, the defendant argues that because the court continued any child support issues for a future hearing, the court was unable to examine the effect of any child support orders on the availability of such exemptions.

"As stated by our Supreme Court when confronted with the question of whether a court may allocate tax exemptions, actions for dissolution of marriage are

inherently equitable proceedings. . . . The power to act equitably is the keystone to the court's ability to fashion relief in the infinite variety of circumstances which arise out of the dissolution of a marriage. Without this wide discretion and broad equitable power, the courts in some cases might be unable fairly to resolve the parties' dispute . . . . Our limited scope of review is consistent with the general proposition that equitable determinations that depend on the balancing of many factors are committed to the sound discretion of the trial court." (Citations omitted; internal quotation marks omitted.) *McCarthy* v. *McCarthy*, 60 Conn. App. 636, 638–39, 760 A.2d 977 (2000).

Nevertheless, "[i]t is fundamental in proper judicial administration that no matter shall be decided unless the parties have fair notice that it will be presented in sufficient time to prepare themselves upon the issue." (Internal quotation marks omitted.) *Connolly* v. *Connolly*, 191 Conn. 468, 475–76, 464 A.2d 837 (1983).

The court's order with respect to the tax dependency exemption must be reversed because the defendant was not given an opportunity to respond or to present any evidence on his view of the most efficient allocation of the exemption. Also, the order was premature given that it was entered prior to the resolution of the related issue of child support. The court understandably sought to fashion complete relief so as to avoid further unnecessary litigation. Absent a pleading demanding such relief, however, the court exceeded its authority in entering the order.[10] Cf. *McCarthy* v. *McCarthy*, supra,

---

[10] Should either party file such a pleading or motion, the court necessarily must determine the availability to the parties of the tax dependency exemption by determining whether, under the court's child support orders, either party provides more than half of the support for the child or whether a multiple support declaration may be filed. See Internal Revenue Service Publication 504, Divorced or Separated Individuals (2004), available at http://www.irs.gov/publications/p504/ar02.html. The court also necessarily should allocate the exemption in the most efficient manner available in light of the income of the parties. See *Serrano* v. *Serrano*, 213 Conn. 1, 12, 566 A.2d 413 (1989).

60 Conn. App. 637 (party filed motion to allocate tax dependency exemption).

## VI

The defendant finally claims that the court improperly issued a protective order prohibiting him from obtaining the plaintiff's medical records. He argues that the records are relevant to the court's decision regarding the amount of time the child would spend with the plaintiff given the defendant's uncertainty of the plaintiff's prognosis for recovery.[11] Even if we assume that the court improperly denied the defendant access to the plaintiff's records, such error would be harmless.

The defendant subpoenaed the plaintiff's medical records. As noted previously, the plaintiff had breast cancer and had undergone a double mastectomy and chemotherapy throughout the trial. The defendant testified that he wanted the child to stay in Connecticut so that she could spend more time with the plaintiff. The court, on the plaintiff's motion, issued a protective order precluding the defendant from accessing the plaintiff's medical records. In its articulation, the court noted that it had issued the protective order because the records were not relevant to any issue in the case.

"We have long recognized that the granting or denial of a discovery request rests in the sound discretion of the [trial] court, and is subject to reversal only if such an order constitutes an abuse of that discretion. . . . [I]t is only in rare instances that the trial court's decision will be disturbed. . . . Therefore, we must discern

---

[11] To the extent the defendant argues that the medical records are relevant to his motion for contempt for the plaintiff's alleged failure to pay child support, we do not review the defendant's claim. The record reveals that the court granted the plaintiff a continuance. The record does not, however, reveal whether the court ruled on the motion, and the defendant does not appeal from the denial of the motion if, in fact, the court later denied the motion. Thus, it would be premature for this court to consider any issues related to the motion for contempt under the final judgment rule.

whether the court could [have] reasonably conclude[d] as it did. . . . When reviewing claims under an abuse of discretion standard, the unquestioned rule is that great weight is due to the action of the trial court and every reasonable presumption should be given in favor of its correctness . . . ." (Citation omitted; internal quotation marks omitted.) *Blumenthal* v. *Kimber Mfg., Inc.*, 265 Conn. 1, 7, 826 A.2d 1088 (2003).

With the exception of the defendant, every witness who testified, *including the plaintiff*, stated that it was in the child's best interest that she live in Colorado with Husaluk despite the plaintiff's illness. Moreover, the court was well aware of the plaintiff's medical condition and heard testimony from the plaintiff relating to her condition. We conclude, therefore, that there is no likelihood that, had the defendant been granted access to the plaintiff's medical records, the court's decisions regarding custody would have been different. See *Schilberg Integrated Metals Corp.* v. *Continental Casualty Co.*, 263 Conn. 245, 278, 819 A.2d 773 (2003) (concluding that, even assuming court improperly denied discovery request, error would have been harmless).

The judgment is reversed only as to the court's order allocating tax dependency exemptions and the case is remanded with direction to render judgment as on file except as modified to remove references to tax exemptions. The judgment is affirmed in all other respects.

In this opinion the other judges concurred.