MARIE J. HUTCHINSON, ADMINISTRATRIX (ESTATE OF DARCIE C. HUTCHINSON), ET AL. *v.* FARM FAMILY CASUALTY INSURANCE COMPANY
(SC 17113)

Sullivan, C. J., and Borden, Norcott, Katz and Vertefeuille, Js.

prohibits relitigation of issue when issue was actually litigated and necessarily determined in prior action).

34

Argued September 20, 2004—officially released March 1, 2005

*Steven L. Seligman,* for the appellant (defendant).

*Robert T. Rimmer,* with whom, on the brief, was *Robert I. Reardon, Jr.,* for the appellees (plaintiffs).

*Opinion*

SULLIVAN, C. J. The plaintiffs[1] filed a bill of discovery against the defendant, Farm Family Casualty Insurance

---

[1] The plaintiffs are Marie J. Hutchinson, individually and as administratrix of the estate of Darcie C. Hutchinson, and Carl Hutchinson.

Company, seeking the production of certain materials covered by the attorney-client privilege that were contained in the defendant's files pertaining to the plaintiffs' insurance claim. After a hearing and an in camera review of the privileged materials, the trial court rendered judgment granting the bill of discovery. The defendant appealed from the judgment to the Appellate Court and, upon a joint motion by the plaintiffs and the defendant, we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-2. We conclude that the trial court improperly granted the bill of discovery. Accordingly, we reverse the judgment of the trial court and remand the case with direction to render judgment denying the bill of discovery.

The record reveals the following relevant facts and procedural history. Darcie C. Hutchinson (decedent), the plaintiffs' twenty-one year old daughter, was killed on September 13, 1996, when a pickup truck driven by Robert A. Milefski, who was driving while under the influence of alcohol, collided with her car. Milefski had automobile liability insurance with a policy limit of $50,000. The decedent was an insured under an insurance policy issued by the defendant to the plaintiffs that provided for uninsured or underinsured motor vehicle coverage with a policy limit of $250,000 per person. In September and October, 1996, the plaintiffs and their attorney had a number of meetings and telephone conversations with the defendant's district claims manager, Marlin J. Cook, concerning the defendant's obligations under the policy. The plaintiffs allege that Cook stated that the defendant would pay the policy limit of the underinsured motorist policy as soon as Milefski's insurer paid his policy limit of $50,000, and that the defendant would deduct *only* that $50,000 from its payment to the plaintiffs.

On October 21, 1996, the plaintiffs brought a wrongful death action against Milefski. The plaintiffs allege that, in reliance on Cook's representations that the defendant would not deduct from its payment to them the value of any assets recovered from Milefski, they rejected an offer by Milefski's insurer to pay the policy limit in exchange for a release of all claims against Milefski and, instead, sought to recover his personal assets. Ultimately, the parties settled the suit for the policy limit of $50,000 and assets in the form of real property.[2] The plaintiffs allege that Cook consented to the settlement and stated again at that time that the defendant would pay the underinsured policy limit less only the $50,000 from Milefski's insurer.

After the defendant failed to make payment, the plaintiffs brought an action in the Superior Court alleging breach of contract, bad faith, violations of the Connecticut Unfair Trade Practices Act, General Statutes § 42-110a et seq., violations of the Connecticut Unfair Insurance Practices Act, General Statutes § 38a-815 et seq., reckless and wilful misconduct and fraud. Thereafter, the action was removed to the United States District Court for the District of Connecticut. On motion of the defendant and over the objection of the plaintiffs, the District Court granted the defendant's motion to compel arbitration of all claims raised in the action and dismissed the action.

Throughout the legal proceedings against the defendant, the plaintiffs sought discovery of the defendant's claims file relating to this matter. The defendant produced a redacted copy of the file, but refused to produce materials that it claimed were covered by the attorney-client privilege. The plaintiffs then brought this action for a bill of discovery seeking disclosure of the privi-

---

[2] The plaintiffs represented to the trial court that this property ultimately was sold and that the net proceeds were approximately $117,000.

leged materials. The trial court held a hearing on the matter on April 14 and May 19, 2003, at which the parties made arguments but presented no evidence. The plaintiffs argued that relevant privileged materials are discoverable in an action in which an insured alleges bad faith against its insurer. The defendant countered that the central issue in the plaintiffs' claim of bad faith was whether Cook had made the representations alleged by the plaintiffs, which ultimately was a credibility issue and had nothing to do with the defendant's communications with its attorneys. It further argued that the privileged materials did not fall into any of the established exceptions to the attorney-client privilege. After conducting an in camera review of the claims file, the court determined that the privileged communications were "relevant in this bad faith action." Accordingly, it concluded that "the [plaintiffs'] allegations of bad faith entitle them to have produced [the] defendant's entire claims file including communications between [the] defendant and its attorneys" and granted the bill of discovery. This appeal followed.

On appeal, the defendant claims that the trial court's determination that the materials were relevant to the plaintiffs' claim of bad faith did not justify disclosure because the materials were subject to the attorney-client privilege and did not fall into any recognized exception to that privilege. The plaintiffs counter that the allegation of a claim of bad faith against an insurer for failure to pay a claim by its very nature requires the disclosure of privileged materials. Accordingly, they argue, the court did not abuse its discretion by ordering disclosure of the materials after it had determined, following an in camera review, that the privileged materials related to the alleged bad faith conduct. We conclude that the trial court improperly determined that the allegation of bad faith entitled the plaintiffs to an in camera

review of the privileged materials and that its finding of relevance justified disclosure of the materials.

We begin by addressing the standard of review. Ordinarily, "[t]o sustain [a bill of discovery], the petitioner must demonstrate that what he seeks to discover is material and necessary for proof of, or is needed to aid in proof of or in defense of, another action already brought or about to be brought." *Berger* v. *Cuomo*, 230 Conn. 1, 6, 644 A.2d 333 (1994). The trial court's ruling on the bill is subject to review for abuse of discretion. See id., 7. Whether the trial court properly concluded that there is an exception to the attorney-client privilege when an insured has made an allegation of bad faith against an insurer, however, and, if so, whether it properly delineated the scope and contours of such an exception, are questions of law. See *Olson* v. *Accessory Controls & Equipment Corp.*, 254 Conn. 145, 168–69, 757 A.2d 14 (2000) (whether court should recognize civil fraud exception to attorney-client privilege and limitations on exception are questions of law). Accordingly, our review of these issues is plenary.

In *Metropolitan Life Ins. Co.* v. *Aetna Casualty & Surety Co.*, 249 Conn. 36, 52, 730 A.2d 51 (1999), this court recognized that the attorney-client privilege "was created to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observation of law and administration of justice. . . . Exceptions to the attorney-client privilege should be made only when the reason for disclosure outweighs the potential chilling of essential communications. It is obvious that professional assistance would be of little or no avail to the client, unless his legal adviser were put in possession of all the facts relating to the subject matter of inquiry or litigation, which, in the indulgence of the fullest confidence, the client could communicate. And it is equally obvious that there would be an end to all confi-

dence between the client and [the] attorney, if the latter was at liberty or compellable to disclose the facts of which he had thus obtained possession . . . ." (Citation omitted; internal quotation marks omitted.)

We also recognized in *Metropolitan Life Ins. Co.* that the attorney-client privilege implicitly is waived when the holder of the privilege has placed the privileged communications in issue. Id., 52–53. "[B]ecause of the important public policy considerations that necessitated the creation of the attorney-client privilege [however], the 'at issue,' or implied waiver, exception is invoked only when the contents of the legal advice is integral to the outcome of the legal claims of the action. . . . Such is the case when a party specifically pleads reliance on an attorney's advice as an element of a claim or defense, voluntarily testifies regarding portions of the attorney-client communication, or specifically places at issue, in some other manner, the attorney-client relationship. In those instances the party has waived the right to confidentiality by placing the content of the attorney's advice directly at issue because the issue cannot be determined without an examination of that advice." (Citation omitted.) Id.

In addition to the "at issue" exception to the attorney-client privilege, this court has recognized a crime-fraud exception to the privilege that extends to civil fraud. See *Olson* v. *Accessory Controls & Equipment Corp.*, supra, 254 Conn. 169. Under the civil fraud exception, the party seeking disclosure of privileged materials must establish both that there is probable cause to believe that the client intended to perpetrate a fraud; id., 174; and that "the communications sought in discovery were made in furtherance of the fraud." Id., 175–76. The reason for the civil fraud exception is not that disclosure of privileged materials is necessary for the resolution of such claims; it is that the justification for the attorney-client privilege simply does not apply in

cases in which a communication was made for an illegal *purpose.* See id., 170–71 ("[w]hile there is a societal interest in enabling clients to obtain complete and accurate legal advice . . . there is no such interest when the client consults the attorney to further the commission of a crime or fraud" [internal quotation marks omitted]); id., 176 ("[m]ere relevance is insufficient [to establish the civil fraud exception]; there must be a showing that the communications at issue were made with an intent to further an unlawful act" [internal quotation marks omitted]); see also *Blumenthal* v. *Kimber Mfg., Inc.,* 265 Conn. 1, 20, 826 A.2d 1088 (2003) (same); id., 20–21 (communication made without intent to break law and for purpose of obtaining sound legal advice does not fall within crime-fraud exception). Indeed, as we expressly stated in *Metropolitan Life Ins. Co.,* when the attorney-client privilege has not been waived, *"the opposing party cannot destroy the . . . privilege by merely claiming a need for the documents.* It would be inconsistent with the nature and purpose of the [attorney-client] privilege to make an exception to the privilege based only on the unavailability of information from other sources." (Emphasis added; internal quotation marks omitted.) *Metropolitan Life Ins. Co.* v. *Aetna Casualty & Surety Co.,* supra, 249 Conn. 56–57, quoting *Admiral Ins. Co.* v. *United States District Court for the District of Arizona,* 881 F.2d 1486, 1494 and n.7 (9th Cir. 1989);[3] see also *Metropolitan Life Ins. Co.* v.

---

[3] The court in *Admiral Ins. Co.* stated that "[t]he attorney-client privilege, like all other evidentiary privileges, may obstruct a party's access to the truth. Although it may be inequitable that information contained in privileged materials is available to only one side in a dispute, a determination that communications or materials are privileged is simply a choice to protect the communication and relationship against claims of competing interests. Any inequity in terms of access to information is the price the system pays to maintain the integrity of the privilege. *An unavailability exception is, therefore, inconsistent with the nature and purpose of the privilege.*

"This conclusion is bolstered by the effect such an exception would necessarily have on the attorney-client privilege. An unavailability exception to the privilege would force counsel to warn their clients against communi-

*Aetna Casualty & Surety Co.*, supra, 56 n.22 (Practice Book § 13-3, providing that certain documents prepared for litigation are discoverable if moving party shows substantial need, encompasses only documents covered by work product doctrine, not those protected by attorney-client privilege).

The defendant contends that the trial court improperly ordered disclosure of the privileged materials because it has not placed the materials "at issue" and the plaintiffs have not alleged civil fraud. A number of courts have concluded, however, that the civil fraud exception should be extended to claims of bad faith against insurers. See *State* v. *Recht*, 213 W. Va. 457, 478, 583 S.E.2d 80 (2003) (Davis, J., concurring) (citing cases); see also *State Farm Fire & Casualty Co.* v. *Superior Court*, 54 Cal. App. 4th 625, 62 Cal. Rptr. 2d 834 (1997) (applying crime-fraud exception to claim of bad faith where insureds established prima facie case that insurer and its agents had deceived insureds about scope of coverage, forged signatures on insurance application and destroyed and manufactured evidence and that attorneys had participated in cover-up); but see *State ex rel. United States Fidelity & Guaranty Co.* v. *Montana Second Judicial District Court*, 240 Mont. 5, 14, 783 P.2d 911 (1989) (civil fraud exception does not apply to statutory bad faith action because legislature did not evince intent to abolish privilege). We conclude that, just as there is no justification for the attorney-client privilege when a communication was made for the purpose of committing fraud, there is no justification for the privilege when a communication was made for the purpose of evading a legal or contractual obliga-

cating sensitive information for fear of subsequent forced disclosure. . . . [I]n terms of access to information, the operation of the attorney-client privilege puts the adversary in no worse position than if the communications had never taken place." (Emphasis added; internal quotation marks omitted.) *Admiral Ins. Co.* v. *United States District Court for the District of Arizona*, supra, 881 F.2d 1494.

tion to an insured without reasonable justification.[4] We also conclude that, in order to protect the confidentiality of good faith communications between the insurer and its attorneys, the same threshold evidentiary requirements for obtaining an in camera review by the trial court when civil fraud has been alleged should apply when bad faith has been alleged. See *United States* v. *Zolin*, 491 U.S. 554, 109 S. Ct. 2619, 105 L. Ed. 2d 469 (1989) (court must require showing of factual basis adequate to support good faith belief by reasonable person that in camera review will reveal evidence that crime-fraud exception applies); id., 571 ("blanket rule allowing in camera review as a tool for determining the applicability of the crime-fraud exception . . . would place the policy of protecting open and legitimate disclosure between attorneys and clients at undue risk"); *Olson* v. *Accessory Controls & Equipment Corp.*, supra, 254 Conn. 183–84 (plaintiff limited to using nonprivileged materials to establish probable cause that defendant committed civil fraud thereby entitling plaintiff to in camera review); id., 182 (providing for in camera review in all cases where crime-fraud exception is alleged is "ill-advised due to the fact that [t]oo much judicial inquiry into the claim of privilege would force disclosure of the thing the privilege was meant to protect" [internal quotation marks omitted]). Accordingly, we conclude that an insured who makes an allegation of bad faith against his insurer is entitled to an in camera review of privileged materials when the insured has established, on the basis of nonprivileged materials,

---

[4] In *Buckman* v. *People Express, Inc.*, 205 Conn. 166, 171, 530 A.2d 596 (1987), this court stated that "[b]ad faith is defined as the opposite of good faith, generally implying a design to mislead or to deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation not prompted by an honest mistake as to one's rights or duties . . . . [B]ad faith is not simply bad judgment or negligence, but rather it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity . . . . [I]t contemplates a state of mind affirmatively operating with furtive design or ill will." (Internal quotation marks omitted.)

probable cause to believe that (1) the insurer acted in bad faith and (2) the insurer sought the advice of its attorneys in order to conceal or facilitate its bad faith conduct.

The plaintiffs argue, however, that the need for disclosure of privileged materials in cases in which an insured has made an allegation of bad faith is sufficient, in and of itself, to justify the disclosure of relevant privileged materials without any additional threshold evidentiary requirement. See *Brown* v. *Superior Court*, 137 Ariz. 327, 336, 670 P.2d 725 (1983) (in action alleging bad faith, insured's "need for the information in the [claims] file is not only substantial, but overwhelming"). We are not persuaded. First, the "information" referred to by the court in *Brown* did not consist of privileged communications, but of materials prepared in anticipation of litigation, to which the "substantial need" standard applies.[5] See id., 332 (insurer objected to production of files containing " 'material prepared in anticipation of

---

[5] The dissent points out that the court in *Brown* also considered the discoverability of "the mental impressions of the insurer's attorneys, which are usually absolutely privileged from disclosure." See *Brown* v. *Superior Court*, supra, 137 Ariz. 337 ("some courts have held that without exception [the mental impressions and legal theories of counsel are] immune from discovery"); see also Practice Book § 13-3 (judicial authority shall not order disclosure of mental impressions, conclusions, opinions, or legal theories of attorney). The court in *Brown* did not apply the "substantial need" standard to the materials; rather, it concluded that the materials must be disclosed because they had been placed "directly at issue." *Brown* v. *Superior Court*, supra, 337. We recognize that the court in *Brown* did not clearly distinguish between the concepts of need and of waiver in this context, and that the opinion could be read as suggesting that privileged materials are always "at issue" in claims alleging bad faith because there is always a need for them. To the extent that *Brown* is subject to such a broad interpretation, we disagree with it. We also disagree with the broad statement in the other case cited by the dissent that, "in an action alleging bad faith denial of insurance coverage, the insured is entitled to discover claims file materials containing attorney-client communications related to the issue of coverage that were created prior to the denial of coverage." *Boone* v. *Vanliner Ins. Co.*, 91 Ohio St. 3d 209, 213–14, 744 N.E.2d 154 (2001).

litigation' "); see also *Metropolitan Life Ins. Co.* v. *Aetna Casualty & Surety Co.*, supra, 249 Conn. 56 n.22. As we have indicated, this court has consistently held that a party's need—even if compelling—cannot destroy the attorney-client privilege. See id., 56–57. Moreover, we see little, if any, practical application for a need-based bad faith exception. When an insured has alleged that the insurer has engaged in bad faith conduct in its handling of a claim, e.g., that it improperly delayed payment, the insurer may either simply deny that the conduct was in bad faith, without alleging any facts in support of its conduct, in which case it takes the risk that the fact finder will find that it had no reasonable basis to act as it did, or it may raise some form of a "routine handling" defense, in which case the "at issue" exception would apply. See, e.g., *Tackett* v. *State Farm Fire & Casualty Ins. Co.*, 653 A.2d 254, 259–60 (Del. 1995) (insurer implicitly waived attorney-client privilege by raising " 'routine handling' " defense to claim of bad faith). In other words, in a typical claim of bad faith, disclosure of privileged materials is necessary for the resolution of the claim precisely *because* the materials have been placed "at issue" by the insurer, in which case the privilege is waived.

Indeed, the facts of this case illustrate the lack of practical application for a need-based exception. The plaintiffs' claim of bad faith requires the resolution of two threshold issues: (1) whether, as a matter of general insurance law, the defendant is contractually entitled to reduce its payments to the plaintiffs by the amount that the plaintiffs recovered from Milefski personally;[6] and (2) if so, whether the defendant is estopped from

---

[6] In their brief to this court, the plaintiffs did not contest the defendant's claim that, as a matter of general insurance law, the defendant is entitled to take a reduction for amounts recovered from a tortfeasor. Rather, the plaintiffs focused exclusively on their claim that the defendant had promised not to take such a reduction. We assume for the purposes of our analysis, however, that the plaintiffs have not conceded this issue.

invoking that contractual right because it promised, through Cook, that it would not do so in order to induce the plaintiffs to seek the recovery. On the first issue, the defendant's attorneys currently take the position, not unreasonable on its face under existing insurance law, that the defendant is entitled under that law and the terms of the policy to make the reduction.[7] If the arbitrators were either to agree with that position or to determine that the position, although incorrect, was not an entirely unreasonable one, then they could not reasonably find that the defendant had taken the position in bad faith. See *Deese* v. *State Farm Mutual Automobile Ins. Co.*, 168 Ariz. 337, 340, 813 P.2d 318 (1991) (breach of contract is prerequisite for claim of bad faith and bad faith arises only when insurer acts without reasonable basis). It would then be irrelevant whether the defendant's attorney, or a different attorney, previously had taken a different position.[8] If, on the other hand, the arbitrators were to determine that no reasonable person could take that position, they reasonably could infer that the defendant had failed to take reasonable steps to determine the scope of its duties under the policy and, therefore, that the defendant had acted

---

[7] The defendant relies on *Lumbermens Mutual Casualty Co.* v. *Huntley*, 223 Conn. 22, 26, 610 A.2d 1292 (1992) (underinsured motorist carrier may limit liability by taking credit for tortfeasor's personal payment to insured). At the April 14, 2003 hearing before the trial court, counsel for the plaintiffs argued that, because the insurance policy was entered into in the state of Maine, it would be governed by Maine law which, they claim, would preclude a reduction for amounts recovered from the tortfeasor.

[8] The plaintiffs argue that insurance companies should not "be able to seek opinions until they receive one that they like and then prohibit disclosure of their bad faith actions through the fiction of not putting the rejected advice 'at issue.' " We see nothing improper per se, however, about seeking multiple opinions on a legal question. The issue is not how many attorneys an insurer has consulted, but whether the legal position ultimately taken by the insurer is objectively reasonable. The trial court, or, in the present case, arbitrators who are experts in insurance law, will be fully capable of making that determination without knowing what took place between the insurer and its attorneys.

in bad faith. In the event that the defendant claimed reliance on the advice of counsel as a defense, however, the privileged materials would be subject to disclosure under the "at issue" exception.

On the estoppel issue, the defendant does not deny that it would have been grossly improper to promise the plaintiffs that it would not reduce its payments by more than the $50,000 recovered from the tortfeasor's insurer and then, after intentionally inducing them to expend time and effort in an attempt to recover damages from the tortfeasor personally, to renege on that promise. The defendant simply denies that Cook made any such promise or had any such intention. Once the arbitrators have made a determination on that factual issue, they will be fully capable of resolving the question of whether the defendant's conduct was sufficiently egregious to constitute bad faith without having access to the privileged materials.[9] Thus, the arbitrators can resolve all of the issues before them on the basis of existing law governing uninsured motorist and promissory estoppel claims without knowing what communications took place between the defendant and its attorneys.

The plaintiffs also argue that, because an insurer owes a fiduciary duty to its insured, "the insurer may

[9] Indeed, it is difficult to imagine how the communications between the defendant and its attorneys could shed any light on this question. It hardly seems likely that the defendant would seek a legal opinion as to whether Cook could misrepresent the defendant's intentions to the plaintiffs in order to induce them to seek recovery from the tortfeasor.

The dissent argues that we have "ignore[d] [the] fact" that proof of the plaintiffs' claim "seems to lie in the privileged materials . . . ." We have not "ignored" that purported fact, however. Rather, we have concluded that: (1) it is unlikely that the claims file will disclose materials relevant, much less necessary, to the resolution of the plaintiffs' estoppel claim; and (2) even if we believed otherwise, need does not abrogate the attorney-client privilege. Moreover, the dissent relies on the "trial court's determination of . . . necessity." We are unable to locate any such determination in the record.

not use the attorney-client . . . privilege as a shield to prevent disclosure which is relevant to the insured's bad faith action." *Zurich Ins. Co.* v. *State Farm Mutual Automobile Ins. Co.*, 137 App. Div. 2d 401, 402, 524 N.Y.S.2d 402 (1988). We are not persuaded that the defendant in the present case had a fiduciary duty to the plaintiffs. *Zurich Ins. Co.* involved an allegation of a bad faith refusal by a liability insurer to settle a claim by a third party against its insured.[10] Id., 401. When a liability insurer undertakes to defend its insured, it "has a continuing duty to use the degree of care and diligence a person would exercise in the management of his or her own business . . . ." *Liberty Mutual Fire Ins. Co.* v. *Kaufman*, 885 So. 2d 905, 908 (Fla. App. 2004). "To this end, when an insurer accepts the defense obligations of its insured, certain interests of the insured and the insurer essentially merge. Such common interests bar, among other things, the attorney-client privilege from attaching to communications among the attorney, the insurer, and the insured." Id.

When the relationship between the insured and the insurer is adversarial at the inception of a claim, however, there is no such fiduciary relationship and the attorney-client privilege protects the insurer from disclosure of privileged materials created after the claim was made. Id., citing *Kujawa* v. *Manhattan National Life Ins. Co.*, 541 So. 2d 1168 (Fla. 1989). In *Kujawa*, the insurer issued a life insurance policy on John Kujawa that named the petitioner as a beneficiary. *Kujawa* v. *Manhattan National Life Ins. Co.*, supra, 1169. After Kujawa was killed, the insurer initially declined to pay the petitioner under the policy, and she

---

[10] The appellant in *Zurich Ins. Co.*, an excess insurer, sought to recover damages from the primary insurer. The court concluded that "the primary carrier owes the same fiduciary obligation to the excess insurer which the primary insurer owes to its insured." *Zurich Ins. Co.* v. *State Farm Mutual Automobile Ins. Co.*, supra, 137 App. Div. 2d 402.

brought a claim of bad faith. The trial court ordered disclosure of the insurer's entire claims file, including privileged documents. On appeal, the Florida District Court of Appeal concluded that there was no fiduciary relationship between the parties justifying the abrogation of the privilege. On appeal to the Florida Supreme Court, the court agreed with the District Court of Appeal that the relationship between the parties was adversarial, not fiduciary, and that the statutory bad faith cause of action did not abrogate the privilege. Id.

We conclude that, in the present case, as in *Kujawa*, the relationship between the plaintiffs and the defendant was adversarial at the time that the claim was made. The defendant did not undertake any actions on behalf of the plaintiffs and they had no interests in common.[11] Accordingly, the principle that the attorney-client privilege does not bar disclosure by a fiduciary to its principal of privileged materials relating to their common interests has no application here.

Having concluded that the trial court applied an improper standard, it remains for us to determine whether the plaintiffs have established, on the basis of nonprivileged materials, that there is probable cause to believe that (1) the defendant has acted in bad faith and (2) the defendant sought the advice of its attorneys

---

[11] The defendant did, of course, undertake contractual obligations to the plaintiffs when it issued the uninsured motorist policy. We previously have recognized, however, that "[t]he fact that one . . . person trusts another [entity] and relies on [the entity] to perform [its obligations] does not rise to the level of a confidential relationship for purposes of establishing a fiduciary duty." (Internal quotation marks omitted.) *Hi-Ho Tower, Inc.* v. *Com-Tronics, Inc.*, 255 Conn. 20, 41, 761 A.2d 1268 (2000).

We recognize, as the dissent argues, that an insurer may have heightened responsibilities to its insured in light of its position of greater power. The dissent has cited no authority, however, for the proposition that the special relationship between an insurer and its insured somehow abrogates the attorney-client privilege even in cases where the relationship between the insurer and the insured is adversarial and the insurer has not communicated with its attorneys for an illegal purpose.

in order to conceal or facilitate its bad faith conduct. We recognize that the trial court did not conduct an evidentiary hearing and made no findings on these issues. Ordinarily, therefore, the record would not be adequate for review. See *Gordon* v. *H.N.S. Management Co.*, 272 Conn. 81, 101, 861 A.2d 1160 (2004). A careful review of the entire record reveals, however, that the plaintiffs have not even *alleged* that the defendant gave information to or sought the advice of its attorneys for the *purpose* of concealing or facilitating its alleged bad faith conduct. Cf. *In re Grand Jury Proceedings*, 102 F.3d 748, 751–52 (4th Cir. 1996) (crime-fraud exception applied when party seeking disclosure established prima facie case that client gave false information to attorneys who unknowingly furthered client's purpose of covering up illegal transaction); *In re Grand Jury Subpoena Duces Tecum*, 731 F.2d 1032, 1041 (2d Cir. 1984) (crime-fraud exception applied when party seeking disclosure established prima facie case that client's communications with attorney were for purpose of fraudulently conveying property to hinder collection of debt and of concealing fraudulent conveyance). Indeed, nothing in the record suggests that the defendant had any purpose in communicating with its attorneys except to obtain complete and accurate legal advice. The plaintiffs allege only that the defendant sought the good faith legal advice of its attorneys and then failed to follow it.[12] Even if we assume the truth of that allegation, that would not bring the communications within the bad faith exception. See *Olson* v. *Accessory Controls &*

[12] Counsel for the plaintiffs represented to the trial court at the April 14, 2003 hearing that the defendant "went shopping for lawyers, because oddly enough when the first lawyer told [it] one thing, [it] went to a different lawyer to see if [it could] get a different answer from somebody else. Then [it went] to a third lawyer to see if [it could] get an answer [it] wanted to hear." Counsel did not state the basis for this belief, however, nor did he indicate the basis for his belief that the advice that the defendant allegedly received from the first attorney that it consulted was sound.

*Equipment Corp.*, supra, 254 Conn. 171 (recognizing "societal interest in enabling clients to obtain complete and accurate legal advice" [internal quotation marks omitted]); id., 175, quoting *State ex rel. North Pacific Lumber Co.* v. *Unis*, 282 Or. 457, 464, 579 P.2d 1291 (1978) ("[g]ood-faith consultations with attorneys by clients who are uncertain about the legal implications of a proposed course of action are entitled to the protection of the privilege, even if that action should later be held improper" [internal quotation marks omitted]). Although the defendant's refusal to follow its attorneys' advice might be relevant for purposes of establishing its state of mind in handling the plaintiffs' claim, we have concluded that the relevance of privileged communications, in and of itself, does not justify abrogating the attorney-client privilege.[13] Accordingly, we conclude that the trial court improperly determined that the plaintiffs were entitled to an in camera review of the privileged materials. A fortiori, the court improperly determined that the plaintiffs were entitled to disclosure of the materials.

The judgment is reversed and the case is remanded with direction to render judgment denying the action for a bill of discovery.

In this opinion BORDEN and KATZ, Js., concurred.

NORCOTT, J., with whom VERTEFEUILLE, J., joins, dissenting. I disagree with the majority's conclusion that the plaintiff insureds should not have obtained a bill of discovery from the trial court because they failed to meet the prongs of the civil fraud exception. Because I conclude that the precautions employed by the trial

---

[13] We have also concluded that, although such evidence might be relevant, it is not *critical* because, if the arbitrators were to determine that no reasonable person could take the defendant's legal position, then they could reasonably infer that the defendant had acted in bad faith on that basis alone.

court in the present case were sufficient to safeguard the attorney-client privilege, but also to allow the plaintiffs to make a claim of bad faith against the defendant insurer that otherwise would be foreclosed to them, I respectfully dissent.

The issue of whether we should recognize an exception to the attorney-client privilege for claims of bad faith against first party insurers, under the limited circumstances of the present case, wherein there was both an in camera review of the disputed documents and a finding of necessity and relevancy, is one of first impression for this court. The majority correctly notes that the attorney-client privilege "was created to encourage full and frank communication between attorneys and their clients . . . [so that] [e]xceptions . . . should be made only when the reason for disclosure outweighs the potential chilling of essential communications." (Citation omitted; internal quotation marks omitted.) *Metropolitan Life Ins. Co.* v. *Aetna Casualty & Surety Co.*, 249 Conn. 36, 52, 730 A.2d 51 (1999). On the other hand, it is also important to recognize that "bad-faith actions against an insurer, like actions by client against attorney, patient against doctor, can only be proved by showing exactly how the company processed the claim, how thoroughly it was considered and why the company took the action it did." *Brown* v. *Superior Court*, 137 Ariz. 327, 336, 670 P.2d 725 (1983). Accordingly, many claims of bad faith by insureds, who risk being taken advantage of when they rely upon their insurers as fiduciaries and have no resources with which to challenge and investigate any suspected wrongdoing, would fail without some form of limited access to the claim file.[1] It is our responsibility as a

[1] The majority reasons that a new, albeit limited, exception to the attorney-client privilege is unnecessary because either: (1) insurers will waive the privilege by asserting a routine handling defense, which puts the privileged materials at issue; or (2) a fact finder will determine that an insurer had no reasonable basis to act as it did in a particular situation. This, however, does not resolve the issue in the present case because although the defendant

court to balance these competing interests; the majority, however, seems insensitive to the latter.

As the majority points out, this court previously has held in *Metropolitan Life Ins. Co.* v. *Aetna Casualty & Surety Co.*, supra, 249 Conn. 56–57, that a claim of need, in and of itself, is insufficient to destroy the privilege. The trial court's three part exception in the present case, however, guarantees *both* need *and* relevance, *and* properly balances need and relevance against the potential chilling effects of this exception on attorney-client communications through the intervention of an independent arbiter. This new exception is, therefore, not inconsistent with our prior holding in *Metropolitan Life Ins. Co.* regarding exceptions to the attorney-client privilege.[2] To the contrary, this combination of need and relevance in the context of the special, quasi-fiduciary nature of the first party insurance relationship between the plaintiffs and the defendant provides a particularly compelling basis for disclosure in the present case.

The majority states that a fiduciary relationship did not exist between the parties in the present case because, as a result of the inherent nature of uninsured and underinsured motor vehicle coverage, their relationship was adversarial from the inception of the claim. It concludes, therefore, that the plaintiffs were not enti-

concedes that misleading insureds about coverage is grossly improper, there is a fundamental factual dispute over whether that was in fact done, proof of which seems to lie in the privileged materials, according to the trial court's determination of relevancy and necessity. The majority ignores this fact and places upon the insured the often impossible burden of proving probable cause to suspect bad faith from facts already obtained. I question whether, without access to the claim file, insureds realistically will be able to provide evidence that the insurer sought legal advice "in order to conceal or facilitate its bad faith conduct," as the majority requires.

[2] I note that *Metropolitan Life Ins. Co.* did not concern a claim of bad faith; therefore, it is not controlling on the issue of whether we should recognize a new exception in the present case other than to warn against doing it on the basis of need alone.

tled to the privileged materials as they would have been had their interests not been adverse. For this conclusion, the majority relies on *Kujawa* v. *Manhattan National Life Ins. Co.*, 541 So. 2d 1168 (Fla. 1989).

American jurisprudence, however, has long recognized that "an insurer and its insured have a 'special relationship' "; *Vu* v. *Prudential Property & Casualty Ins. Co.*, 26 Cal. 4th 1142, 1150, 33 P.3d 487, 113 Cal. Rptr. 2d 70 (2001); that is " 'characterized by elements of public interest, adhesion and fiduciary responsibility.' " *White* v. *Unigard Mutual Ins. Co.*, 112 Idaho 94, 99, 730 P.2d 1014 (1986). These characteristics, along with unequal bargaining power, leave insureds no choice but to "depend on the good faith and performance of the insurer." *Vu* v. *Prudential Property & Casualty Ins. Co.*, supra, 1151. "In the seminal cases in which this court has recognized the existence of a fiduciary relationship, the fiduciary was . . . in a dominant position, thereby creating a relationship of dependency . . . ." (Internal quotation marks omitted.) *Biller Associates* v. *Peterken*, 269 Conn. 716, 723–24, 849 A.2d 847 (2004). Accordingly, this unique dependency imposes fiduciary-like duties on the part of first party insurers, which are greater and distinct from the duties of parties to ordinary commercial contracts.

Moreover, although the majority fails to mention them, there are many jurisdictions outside of Florida that recognize a fiduciary-like duty of insurers to insureds even in the context of adversarial first party relationships. See *Manhattan Fire Ins. Co.* v. *Weill & Ullman*, 69 Va. 389, 26 Am. Rep. 364 (1877); see also *White* v. *Unigard Mutual Ins. Co.*, supra, 112 Idaho 99–100 (recognizing "covenant of good faith and fair dealing" and describing relationship between first party insurers and insureds as "special"); *Motorists Mutual Ins. Co.* v. *Said*, 63 Ohio St. 3d 690, 699, 590 N.E.2d 1228 (1992) ("the duty of an insurance company to its

insured is analogous to that of a fiduciary"); *Danner* v. *Auto-Owners Ins.*, 245 Wis. 2d 49, 69, 629 N.W.2d 159 (2001) (stating that insurer has special fiduciary relationship to insured). Due to the diversion of interests in first party relationships, however, I am more persuaded by the reasoning of jurisdictions that recognize first party insurance contracts as quasi-fiduciary. In *Peterman* v. *State Farm Mutual Automobile Ins. Co.*, 961 P.2d 487, 494 (Colo. 1998), the court aptly stated that "[w]e recognize that the insurer becomes almost adversary to its own insured in the context of uninsured motorist coverage, but that conflict does not vitiate the underlying contractual and quasi-fiduciary duty that the insurer owes its insured." Fundamentally, first party insurance contracts are *not* arm's-length transactions, and they involve the same relationship of dependency on insurers' good faith that characterizes third party contracts. I am therefore puzzled as to how the majority could consider them to be anything less than quasi-fiduciary.

This principle is consistent with the advertising of the insurance industry itself, which assures customers that they are "in good hands or dealing with a good neighbor." (Internal quotation marks omitted.) *White* v. *Unigard Mutual Ins. Co.*, supra, 112 Idaho 99. Accordingly, this special relationship supports the adoption of a limited new exception to the attorney-client privilege in the context of allegations of bad faith against first party insurers.

Additionally, the states of Ohio and Arizona similarly have recognized exceptions to the attorney-client privilege and the privilege accorded to attorneys' mental impressions, respectively, for claims of bad faith against insurers. In *Boone* v. *Vanliner Ins. Co.*, 91 Ohio St. 3d 209, 213–14, 744 N.E.2d 154 (2001), the court held that "in an action alleging bad faith denial of insurance coverage, the insured is entitled to discover claims file

materials containing attorney-client communications related to the issue of coverage that were created prior to the denial of coverage." Similarly, in *Brown* v. *Superior Court*, supra, 137 Ariz. 337–38, the Arizona Supreme Court concluded that the denial of a motion to compel production of an insured's loss of earnings claim file was improper because claims of bad faith against insurers give rise to an overwhelming need for disclosure of such information.[3]

I am simply not persuaded that such a limited exception to the privilege will have a chilling effect on attorney-client communications. An in camera review of the otherwise privileged communications provides an independent review of the disputed materials and ensures that they are relevant to the claim of bad faith in particular. This is consistent with the standard applied by this court to bills of discovery. In order for a trial court to grant a bill of discovery, "[a] plaintiff must be able to demonstrate good faith as well as probable cause that the information sought is both material and necessary to his action." *Berger* v. *Cuomo*, 230 Conn. 1, 7, 644 A.2d 333 (1994). Similarly, in cases of parties alleging claims of bad faith against their first party insurers, as is the case here, it is the trial court's role to ensure relevancy and necessity of disclosure by means of an in camera review. This limited level of judicial intervention is sufficient to minimize the risk of undue interference with attorney-client communications.

---

[3] The majority states that the information sought in *Brown* v. *Superior Court*, supra, 137 Ariz. 327, consisted only of nonprivileged materials prepared in anticipation of litigation to which the substantial need standard applies, implying that it has no relevance to the present case. This characterization is inaccurate because the information sought and disclosed in *Brown* was the *entire* claims file, which included, among other things, the mental impressions of the insurer's attorneys, which are usually absolutely privileged from disclosure. Id., 337. The court explained that it based its decision to allow a limited exception for these materials on overwhelming need, stating that the materials sought were central to the plaintiff's claim of bad faith. Id., 338.

I, therefore, conclude that the three part analysis that the trial court employed in the present case provides a sensible limited exception to the attorney-client privilege. On the one hand, it recognizes the overwhelming need for claims information in the context of claims of bad faith by insureds against their first party insurers, as well as the fiduciary-like nature of the relationship between them. On the other, it limits this greater availability of otherwise privileged communications to those specifically necessary and relevant to the claim of bad faith by means of an in camera review. This is the same benchmark already utilized in decisions regarding bills of discovery. Accordingly, it is very narrow and, at the same time, consistent with the principles of fairness and justice underlying the quasi-fiduciary nature of insurance contracts and the attorney-client privilege itself.

I conclude that the trial court did not abuse its discretion by ordering disclosure of the privileged communications in this matter. I would therefore affirm the trial court's judgment. Accordingly, I respectfully dissent.